## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AARON ABADI**

82 Nassau Street Apt 140

New York, NY 10038,

        Plaintiff

V.

**NATIONAL RAILROAD**

**PASSENGER CORPORATION**

**DBA AMTRAK**

1 Massachusetts Ave.

NW Washington, DC 20001,

        Defendant.

CASE #  1:22-cv-03684 (TNM)

**1ST AMENDED COMPLAINT**

& JURY DEMAND

May 22, 2023

Plaintiff, Aaron Abadi, brings this action pro se, against the defendant, Amtrak, alleging that defendant discriminated against him due to his disability, conspired to deny him his civil rights, and neglected to prevent interference with his civil rights, when they had that opportunity. The defendant that the Plaintiff listed so far, is only the company itself.  Other defendants may be added, after obtaining permission from the court, upon receipt of discovery, including the

person that responded to the email denying access to Plaintiff, and the conductor that discriminated, as described herein.

Additionally, Defendant invoked an Arbitration Agreement that they claim Plaintiff is compelled to abide by (Doc 12 & exhibits). Plaintiff alleges that this Arbitration Agreement is unconstitutional, invalid, and illegal.

Plaintiff requests injunctive relief, declaratory relief, compensatory damages, punitive damages, and any other relief that the court shall determine, and/or any relief that will become apparent and appropriate upon the exchange of discovery.

In addition to the discrimination claims, Plaintiff Aaron Abadi brings this action to obtain declaratory and injunctive relief to prevent defendant National Railroad Passenger Corporation (Amtrak), a corporation created, owned, and controlled by the federal government, from imposing an arbitration requirement on rail passengers and purchasers of rail tickets. Amtrak has included an "agreement" in its on-line terms of service that purports to require ticketed passengers and ticket purchasers to resolve past, present, and future disputes with Amtrak through binding arbitration before a private arbitrator. The arbitration provision prohibits passengers and purchasers from arbitrating their claims on a class or representative basis. Passengers and purchasers who disagree with the arbitrator's decision cannot seek review or reversal of that decision in an Article III court or any other court, except on the circumscribed grounds set forth in the Federal Arbitration Act.

The arbitration requirement prevents Amtrak's passengers and purchasers from waiting until a dispute has arisen before deciding whether binding arbitration is in their best interest. Rather, they must either submit to the arbitration requirement or forgo Amtrak's rail service.

Plaintiffs Aaron Abadi has traveled on Amtrak in the past multiple times, and has plans to use Amtrak in the future. Specifically, Plaintiff has a flight booked from Laguardia Airport in New York leaving on June 8, 2023, and returning to Newark Airport on June 13, 2023. Plaintiff will be coming from and returning to Philadelphia at those times. The ideal way to travel to and from those airports to Philadelphia, is by Amtrak train. Plaintiff wishes to use Amtrak's services without prospectively relinquishing his right to seek judicial redress for claims he may have against Amtrak. Plaintiff did not yet book those tickets, as he refuses to click that box that forces him into arbitration. He additionally has a need to use Amtrak on many trips in the future, especially when traveling to and from any of the international airports in the New York area. Plaintiffs seek declaratory and injunctive relief so that he may use Amtrak's passenger rail services without fear of forever forfeiting his constitutional and legal rights to have any claims against Amtrak adjudicated in an Article III court.

Declaratory and injunctive relief is warranted because Amtrak's imposition of an arbitration requirement on passengers and purchasers is unlawful ultra vires action. Amtrak is a federal governmental entity: It was created by the federal government, is owned and controlled by the federal government, and is charged with carrying out important federal public-policy objectives regarding passenger rail transportation. Although Congress made a policy choice that Amtrak should be operated and managed as a for-profit corporation, Congress did not grant Amtrak the authority to require rail passengers and ticket purchasers to waive their rights to seek redress for their injuries before an Article III court. Amtrak's decision to impose that requirement cannot be reconciled with its congressionally assigned mission of providing rail transportation services to the public.

Declaratory and injunctive relief is also warranted because Amtrak's arbitration requirement violates the U.S. Constitution. Amtrak is a creature of Congress and is subject to constitutional constraints like other government-created, government-controlled establishments. Amtrak's arbitration requirement violates the Constitution in three discrete ways: First, the arbitration requirement forces passengers and ticket purchasers, as a condition of rail travel, to give up their First Amendment right to petition courts for a redress of grievances against the government. Second, the Constitution forbids a federal governmental entity such as Amtrak from forcing individuals to give up their right to have disputes adjudicated by an Article III judge and instead requiring them to agree to submit claims against the government to binding arbitration before private adjudicators, as Amtrak's arbitration requirement purports to do. Third, Amtrak's arbitration requirement threatens the institutional integrity of the judicial branch by creating a wholly separate, private process for the resolution of claims, including constitutional and commonlaw claims, that is not subject to meaningful judicial oversight by Article III courts. If Amtrak can require individuals to cut federal courts out of the picture in this manner, nothing stops Congress from mandating private arbitration for any and all claims against the federal government and undermining the judicial branch's role in the constitutional separation of powers.

## **PARTIES**

1)    Plaintiff, Aaron Abadi ("Abadi"), resides in the City of New York. His address is 82 Nassau Street, Apt. 140, New York, NY 10038.

2)      Abadi expects to travel to and from New York City airports and to and from

Philadelphia, as his girlfriend lives in Philadelphia area and he is constantly traveling there.

Abadi wishes to have the ability to use Amtrak's passenger rail services without having to agree

in advance to binding arbitration before a private arbitrator and waiving his rights to seek a

judicial remedy, on an individual basis or as part of a representative or class action, for resolution

of any claims against Amtrak. Abadi does not want to be forced to drive or take other

transportation, which may be more inconvenient, burdensome, or expensive than passenger rail

travel, to avoid being bound by Amtrak's arbitration requirement.

3)      Defendant, NATIONAL RAILROAD PASSENGER CORPORATION DBA

AMTRAK ("Amtrak"). is headquartered in the District of Columbia.  Its registered address is at

1 Massachusetts Ave., NW Washington, DC 20001.

4)      Defendant Amtrak is a federally chartered corporation organized under the laws

of the District of Columbia. Amtrak's principal business is providing intercity passenger rail

transportation to the public.


## JURISDICTION & VENUE

1)      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

1331, which provides district courts with jurisdiction over civil actions arising under the United

States Constitution or laws of the United States. Amongst other claims, Plaintiff is alleging

violations of the federal ADA laws 42 U.S. Code § 12182, The Rehabilitation Act ("RA") of

1973 § 504, 29 U.S.C. § 794 (a), 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights,

and 42 USC § 1986, Neglecting to Prevent Interference with Civil Rights.

2)      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case presents claims arising under federal law and the U.S. Constitution, and under 28 U.S.C. § 1349 because Amtrak is a federally chartered stock corporation and the United States owns more than one-half of Amtrak's capital stock.

3)       This Court has jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, and there is diversity of citizenship, as Plaintiff is a resident of the State of New York, and Amtrak is based in Dallas, Texas.

4)      This court has jurisdiction under 28 U.S. Code § 1369 C 2, as Amtrak does substantial business in Washington, DC, and has its main headquarters there. The statute reads as follows, "a corporation is deemed to be a citizen of any State, and a citizen or subject of any foreign state, in which it is incorporated or has its principal place of business, and is deemed to be a resident of any State in which it is incorporated or licensed to do business or is doing business."

5)      Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c)(2) because Amtrak resides in the judicial district in which this Court sits and is subject to the personal jurisdiction of this Court.

6)      Venue is proper pursuant to 28 U.S.C. 1391(b) because the events giving rise to the allegations in this complaint occurred in this district, as in many others. The notification and discrimination were done by email to Plaintiff in New York City, presumably sent from Amtrak in Washington, DC.

7)      Plaintiff has standing to sue Defendant, as his injuries were a direct result of actions taken by Defendant.

8)      Plaintiff has standing with regards to the arbitration agreement, as Amtrak invoked this arbitration agreement against him, by filing a Motion to Compel Arbitration (Doc 12), on May 18, 2023. "virtually every court to encounter a challenge to an arbitration clause has held: a challenger lacks standing unless and until an incident gives rise to a plaintiff's claim and a defendant invokes the arbitration clause." Silberman, Senior Circuit Judge, DC Circuit Court of Appeals, Weissman v. National Railroad Passenger Corporation, 21 F.4th 854 (2021).

## FACTUAL ALLEGATIONS

### BACKGROUND

9)      Amtrak's Establishment and Governance

10)      In the Rail Passenger Service Act of 1970, Congress authorized the establishment of Amtrak. Pub. L. No. 91-518, § 301, 84 Stat. 1327, 1330. Congress determined that the "[p]ublic convenience and necessity require that Amtrak, to the extent its budget allows, provide modern, cost-efficient, and energy-efficient intercity rail passenger transportation between crowded urban areas and in other areas of the United States." 49 U.S.C. § 24101(a)(1). Congress expected that Amtrak's rail service "can help alleviate overcrowding of airways and airports and on highways" and offer travelers "the greatest possible choice of transportation most convenient" to their needs. Id. § 24101(a)(2), (3). Congress accordingly directed Amtrak "to provide efficient and effective intercity passenger rail mobility." Id. § 24101(c).

11)      Amtrak is substantially owned by the federal government. As of September 30, 2018, the U.S. Department of Transportation owned 109,396,994 shares of Amtrak's preferred stock, representing all of Amtrak's issued and outstanding preferred stock. Each share of Amtrak's preferred stock is convertible to 10 shares of common stock. As of September 30,

2018, Amtrak's issued and outstanding common stock totaled 9,385,694 shares out of 10 million authorized shares. Amtrak's common stock is held by private entities. The ratio of the government's ownership interest to that of private entities thus exceeds 100 to 1.

12) Amtrak is controlled by the federal government. By statute, Amtrak's board of directors consists of 10 directors, of whom one is the Secretary of Transportation sitting *ex officio*. Eight other directors on Amtrak's board are appointed to that position by the President of the United States and must be confirmed by the Senate. The tenth director on Amtrak's board is the president of Amtrak, who serves as a nonvoting member. The president of Amtrak and Amtrak's other corporate officers are named and appointed by Amtrak's board of directors. 49 U.S.C. §§ 24302(a)(1), 24303(a).

13) By statute, Amtrak is "operated and managed as a for-profit corporation." 49 U.S.C. § 24301(a)(2). Amtrak, however, has received annual appropriations from Congress throughout its existence. In 2015, Congress authorized a total of $8.1 billion over five years in annual funding for Amtrak through fiscal year 2020. Congress has also capped Amtrak's liability for personal injury, death, and damage to property arising out of a single accident or incident at $294.3 million. 49 U.S.C. § 28103(a); 81 Fed. Reg. 1289 (Jan. 11, 2016).

14) Although Amtrak "is not a department, agency, or instrumentality of the United States Government," 49 U.S.C. § 24301(a)(3), the Supreme Court has held that Amtrak is  a component of the federal government for purposes of the Constitution. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995).

*Amtrak's Arbitration Requirement*

15)     Amtrak provides rail services to millions of passengers using a nationwide rail network located in 46 states and the District of Columbia. Amtrak is the country's primary provider of intercity passenger rail service, and it is the only high-speed intercity passenger rail provider in the United States. In many communities that lack intercity bus or airline service, Amtrak is the only intercity passenger transportation service. In 2018, passengers took more than 31 million trips on Amtrak trains.

16)     Beginning on or about January 2019, Amtrak unilaterally amended the terms and conditions on which it would provide passenger rail transportation services to the public to include a binding "Arbitration Agreement." Amtrak posts the current terms and conditions, including the Arbitration Agreement, on its website at https://www.amtrak.com/terms-and-conditions.html. The website states that: "These terms and conditions contain a binding Arbitration Agreement below. … By purchasing a ticket for travel on Amtrak, You are agreeing to these terms and conditions and agreeing to the Arbitration Agreement."

17)     The Arbitration Agreement purports to bind both any person who purchases a ticket and any individual for whom a ticket is purchased. The Arbitration Agreement states that the purchaser and passenger agree in advance to submit any claims against Amtrak to binding arbitration. By its terms, the Arbitration Agreement extends, with limited exceptions, to claims "past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration." If their arbitration agreement were to be valid, any person ever traveling on Amtrak, will be <u>committed for life</u> to only be able to file claims against Amtrak through arbitration.

18)     The Arbitration Agreement states that it applies to claims against Amtrak, its affiliates and related entities, and any party to which Amtrak would owe an indemnity, including host railroads. A host railroad is a freight railroad whose tracks Amtrak uses to provide passenger services.

19)     The Arbitration Agreement states that it is "intended to be as broad as legally permissible." The Agreement states that it applies "without limitation" to claims and disputes "based upon or related to: these Terms and Conditions, breach of contract, tort claims, common law claims, Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, any personal injuries…, and any claims for discrimination and failure to accommodate," unless an applicable federal statute provides that a claim cannot be arbitrated.

20)     The Arbitration Agreement states that it requires binding arbitration of claims before a single arbitrator. The Agreement vests the arbitrator with exclusive authority to resolve disputes relating to the validity, applicability, enforceability, unconscionability, or waiver of the Arbitration Agreement, including any claim that all or any part of the Arbitration Agreement is void or voidable. Except with respect to the class-action waiver, the Agreement expressly purports to deny any court or agency the authority to decide whether the Arbitration Agreement is valid.

21)     The Arbitration Agreement contains a class-action waiver. The class-action waiver requires passengers to arbitrate on an individual basis and bars them from participating in a class or representative action against Amtrak. Under the Arbitration Agreement, only a court, and not the arbitrator, can resolve disputes concerning the interpretation, applicability, enforceability, or waiver of the class-action waiver.

22)     The Arbitration Agreement states that the arbitration must be conducted under the Consumer Arbitration Rules of the American Arbitration Association (AAA). The Arbitration Agreement authorizes a court of competent jurisdiction to enter judgment upon the arbitrator's decision or award. The Arbitration Agreement is governed by the Federal Arbitration Act. Under the Federal Arbitration Act, a federal court may vacate, modify, or correct an arbitrator's decision only for circumscribed, statutorily specified reasons. 9 U.S.C. §§ 10, 11.

23)     Arbitrators selected under AAA rules are not Article III judges or any other type of officer of the United States.

24)     Because the Arbitration Agreement is a compulsory, non-negotiable term under which Amtrak will provide service, travelers are required to either accept the Agreement's terms or forgo Amtrak's passenger rail transportation service.

### Discrimination Facts Alleged

25)     Defendant owns and operates the largest train company in the U.S., that provides train service for travelers throughout the United States and beyond.

26)     The Covid-19 virus that arrived from Wuhan, China, spread throughout the world, causing significant death and hospitalizations, during the end of 2019, though 2020, and continuing in 2021 and 2022.

27)     The Center for Disease Control ("CDC") announced guidance for requiring all people to wear masks in public places and on transportation services. The guidance varied as the time progressed.

28)     Throughout this pandemic, most, if not all mask mandates, mask guidance, and related laws, included wording to remind people that children under 2 years old and people with

a disability that causes that the person cannot wear a mask, are exempt. The ADA put out a guide elaborating on the types of disabilities that would not be able to wear masks. It's named, "The ADA and Face Mask Policies." It says, "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety." It recommends that they should not wear a mask. Link:

https://adasoutheast.org/disability-issues/ada-and-face-mask-policies/#:~:text=The%20ADA%20does%20not%20have,governments%20or%20private%20business%20owners.

29)    Plaintiff, Aaron Abadi, while he does not have autism, he does have sensory processing disorder, which is the actual disorder that an autistic child would have, if sensitive to touch to a point of possibly causing sensory overload.  It is listed on his medical records. Attached as Exhibit A & Exhibit B, are a doctor's letter, and a copy of the medical chart from plaintiff's doctors, and an affidavit by confirming this.

30)    Attached is a copy of an affidavit by Plaintiff's Neurologist submitted in another action in Florida, confirming that Plaintiff is disabled under the ADA guidelines (Exhibit C).

31)    Plaintiff states that he had this condition his entire life.  He could not wear glasses, sunglasses, baseball caps on his head and face, as it will cause a serious sensory overload.  He also has difficulties wearing neckties and starched shirts. Anything around the face or head is a serious problem.

32)    This is not simply a discomfort.  Our senses send messages to our brains, and when there's a dysfunction in those messages, the brain gets the wrong message.  When I try to wear a mask or any of those other items I mentioned, it starts off with extreme discomfort and

pretty quickly turns into unbearable, where I will rip it off without any regard of the

consequences.  It is also coupled with headaches and other irritation. I cannot wear a mask at all.

33)     As per ADA guidelines, this Petitioner should be exempt from wearing a mask.

See the ADA and Face Mask Policies _ Southeast ADA Center, where it clearly defines the

sensory disability, and states that such a person should be exempt from mask rules. In any case,

sensory processing disorder, when activated, creating sensory overload, it limits almost all major

life activities, as the Petitioner cannot function, and thus it clearly fits the criteria set by ADA.

34)     In clarifying the definition of disability, 28 CFR § 36.105 (1) says "Physical or

mental impairment means: (i) Any physiological disorder or condition, cosmetic disfigurement,

or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal,

special sense organs, respiratory (including speech organs), cardiovascular, reproductive,

digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."

35)     Petitioner's disorder affects the body system related to the sense of touch,

specifically, and is included in the above definition of disability. Touch is the ability to sense

pressure, vibration, temperature, pain, and other tactile stimuli. These types of stimuli are

detected by mechanoreceptors, thermoreceptors, and nociceptors all over the body, most

noticeably in the skin. These receptors are especially concentrated on the tongue, lips, face,

palms of the hands, and soles of the feet. The law recognizes that a disorder in the important

sense of touch severely limits many major life activities.

36)     The Doctor's letter confirms that the Plaintiff already had Covid and was no

longer contagious. The CDC states that Covid reinfection is rare (Exhibit D). This is not to say it

cannot happen, but the public accommodation is responsible to apply logic and make an honest

risk assessment. Under these circumstances, Plaintiff argues that without obvious symptoms, he

cannot be considered a direct threat, which is defined as a significant risk, when it comes to

disability laws.  It is certainly a good idea to increase precautions, but it doesn't create a direct

threat, and therefore it doesn't allow discrimination.

37)     The Equal Employment Opportunity Commission ("EEOC") has a similar

guidance to the effect that only those with Covid or its symptoms can be considered a direct

threat (Exhibit E) . Link: https://www.eeoc.gov/laws/guidance/pandemic-preparedness-

workplace-and-americans-disabilities-act

38)     It states the following: "These facts manifestly support a finding that <u>a significant

risk of substantial harm would be posed by having someone with COVID-19, or symptoms of it,

present in the workplace at the current time</u>." Without even symptoms there's no justification to

consider me a "direct threat" AKA a significant risk.

39)     Now, for arguments sake, if you were to say that anyone <u>without</u> a mask is a

direct threat, then you would have to prove that everyone <u>with</u> a mask, including all the most

common masks that are useless, are suddenly no longer a direct threat.  Otherwise, that's

discrimination.

40)     The medical community and including the CDC, the NIH, and the WHO, evolved

in regards to their expectations of the value of a typical face mask in protecting people from

Covid 19. Even to date, there is no clear peer-reviewed study that can confirm the importance

and benefits of wearing masks as is being worn currently. The CDC themselves confirm that we

do not have real evidence (Exhibit F). Most of us say, it probably cannot hurt, although some

studies say that it can. Plaintiff is not looking to adjudicate that issue, if not requested to by the

court, or the Defendants.  Suffice it to say that the typical mask is questionable as to its

protection.

41)     Defendant, Amtrak, discriminated against Plaintiff, conspired to discriminate, and did not attempt to stop the discrimination.

42)     There were many employees, staff, executives, and even attorneys that were part of this conspiracy and/or participated in the discrimination. During discovery, we will ask for that information, and add those defendants to this action, if the Court will permit it.

43)     On January 22, 2021, at 4:45 PM, I was on the train (Acela 2170 in car 6 seat 17F) without a mask leaving Philadelphia station, heading to New York City. I have a medical disability that causes me not to wear a mask. Specifically sensory integration disorder.

44)     The person checking the tickets on the train asked me to wear a mask. I explained about my disability. He said then you cannot travel on Amtrak. I explained to him that federal guidelines and the States of NJ, PA, and NY all exempt me from wearing a mask, and that the ADA laws require him to accommodate me.

45)     He yelled at me and said "no, you cannot be on the train at all, and we are not bound by any of those laws." Thankfully, the train already started moving, so he couldn't throw me off.  He kept this going for about 7 or 8 minutes and finally left me alone.

46)     People without disabilities were not treated this way.

47)     I contacted Amtrak on 08/20/2021.  this time they were a bit more cooperative. They stated that an exemption was possible, but not guaranteed, however there were restrictions in place that would made it very difficult for me to travel by train.

48)     A normal person can just go to an Amtrak train, hop on and get to their destination.  I would be required to write letters and give advance notice, and yet not be sure if I will be allowed to ride anyway.  If that isn't discrimination, I don't know what is.

49)    They should just accept the letter that I sent them and put a note on my account that I've been approved for maskless traveling.  Simple, just like Air France did.  These complex approval processes are deliberately put in place to deter and make it almost impossible to travel.

50)    The email from them (Exhibit G) came seven days after I filed the request.  It was understood that they would not give a blanket exemption, but every trip I would have to give them 72-hours notice and hope they said it was okay.

51)    I already sent them my doctor's letter and explained that I was disabled, yet they chose to create a complicated bureaucratic system, to keep me away from their trains.

52)    Non-disabled people just walk on a train at a moment's notice, but I have to jump through hoops in order to travel, due to my disability. I would have to wait days and pray that they allow me to travel.

53)    Obviously, they were deeming me a health risk without really evaluating me individually, just assuming that any applicants for mask exemptions are a direct threat to others. This is in contradiction to all the disability laws.

54)    To me this felt like gaslighting, as it is very clear that I am not a "Direct Risk," as I already had Covid, and the CDC says, "Covid reinfections are rare."  Additionally, the EEOC clarified that you need symptoms to be considered a risk. I didn't have symptoms when I made the request, and I would never go if I had symptoms.

55)    Additionally, ADA's meaning of direct threat would not apply to masks for Covid, as the protection of a typical mask from Covid is negligible, as proven in multiple studies, and without any evidence of me having Covid, they cannot label me as a Direct Threat.  ADA law requires an individualized assessment, which was not done.

56)    I should be entitled to live and move around like other people.  State & Federal Law requires them to exempt me from a mask and accommodate me. I was discriminated against due to my disability, and my entire family had to suffer.

57)    Although, Amtrak did seem to have a way for someone like me to travel, it was so complicated, almost impossible to work out, and so much more complicated than any non-disabled person.

58)    Most people like to travel on short notice, I know that I do.  With this complex exemption approval process, that would be impossible.  That is discrimination.  Why shouldn't I be treated like everyone else?! Why shouldn't I have the same rights?!

59)    Non-disabled people are not required to wait up to 72 hours before a booked ride to be approved to travel. There is no reason that they cannot review my case once in the beginning, learn that I have a permanent disability that causes me to never be able to wear a mask, and give me a permanent exemption, without playing all these games.

## INJURIES & AFFECTS

60)    The losses are financial, as I was denied basic services and privileges that all people have access to. I was already denied the right to travel on airlines and buses, so my only remaining option was by train. I had business opportunities that required me to travel and I wanted to travel for pleasure too. I was denied my right to travel.

61)    Business funding and other business opportunities were ruined due to Plaintiff's inability to travel.

62)    Amongst many projects, Plaintiff had a lucrative contract with several entities. His inability to travel by plane, train, and bus caused him to lose those prospective deals.

Attached (Exhibit H) is an affidavit attesting to these losses. There are many business losses that were caused directly by the actions of the Defendant. During discovery the details will be provided. Losses are recorded in excess of one billion US dollars.

63)     Additionally, the emotional toll and anxiety caused from being discriminated against is significant, and probably much more than the financial.

64)     Plaintiff was deprived by Defendant of his civil liberties, as a person with disabilities.

65)     On average, I go to ten states or more each year. I travel a lot. I was trying to raise money for a business project and was not able to get to California to meet prospective funders.

66)     I have been unemployed. I spent seven years and a lot of money on this business project. If I were able to complete it, I would not be in this serious financial distress, which is painful, and causes serious emotional anguish and anxiety.

67)     Disabled people have a right to not be discriminated against. Human beings have a right to be treated like human beings. My rights were stripped from me.

68)     The injuries from the arbitration clause are also very significant. Plaintiff's constitutional right to due process was taken from him. He no longer can litigate his case in a Court. There are no appeals processes available to him. One inexperienced mediator can make decisions without any recourse.

69)     The big Amtrak, government owned conglomerate, controls even the litigation of its wrongs. They are 99% owned by the federal government. Plaintiff should be entitled to his due process rights.

## CAUSE OF ACTION

## COUNT ONE

70) **ADA Discrimination on the basis of disability in a public accommodation.**

For the first count, Plaintiff alleges that defendants violated the Americans with Disabilities Act of 1990 ("ADA") on multiple occasions, specifically ADA Title III 28 CFR Part 36 - Nondiscrimination on the basis of disability by public accommodations and in commercial facilities.

71)     Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

72)     Plaintiff alleges that Defendants discriminated against him due to his disability and did not allow him equal access to the public accommodations described herein.

73)     In defining public accommodation, it clarifies the following: 28 CFR Part 36 § 36.104 "Place of public accommodation means …(7) A terminal, depot, or other station used for specified public transportation."

74)     It continues to state: "Specified public transportation means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis."

75)     The ADA states § 36.201(a) "Prohibition of discrimination. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." See § 36.202 for a breakdown of the various types of illegal

discrimination, including: (a) denial of participation, (b) participation in unequal benefit, & (c) separate benefit. The above factual allegations show multiple violations of these laws.

76)    Amtrak has a stated policy that all people entering their locations and/or riding on their trains must wear masks.  This was repeated to the defendant. The employees seem to believe that, Amtrak is a private company and they can create their own policy, whether or not it complies with the law.

77)    ADA law requires the Defendants to modify their policy to accommodate a person with a disability when they cannot wear a mask.  42 U.S.C. § 12182(a).[3] "The ADA defines discrimination to include: [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations...."

78)    In clarifying the definition of disability, 28 CFR § 36.105 (1) says "Physical or mental impairment means: (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."

79)    Plaintiff's disorder affects the body system related to the sense of touch, specifically, and is included in the above definition of disability. Touch is the ability to sense pressure, vibration, temperature, pain, and other tactile stimuli. These types of stimuli are detected by mechanoreceptors, thermoreceptors, and nociceptors all over the body, most

noticeably in the skin. These receptors are especially concentrated on the tongue, lips, face, palms of the hands, and soles of the feet.

80)     While the Defendant seems to suggest that the reason of their discrimination is for safety, ADA Law § 36.301 (b) says, "A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." This requirement of actual risk is a very similar concept to the next paragraph, discussing direct threat.

81)     A public accommodation can deny access when there's a "direct threat." § 36.208 (b) "In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." Defendant seemed to have believed that Plaintiff coming in without a mask will pose a direct threat.

82)     If the CDC believed that anyone without a mask was a "direct threat," they would have been careless and negligent in their duties to allow for such exemptions at all. Even for eating and drinking, how can you kill people just because you want to eat and drink?! Obviously, the idea was to reduce the overall spread, and not to suggest that all people are a direct threat without a mask.

83)     It is understood from the previous paragraphs that a person, even without already having Covid, is not considered a direct threat or an actual risk, without any symptoms, and

without any indication that they may have any disease, as the rate of transmission and the statistics showing the risk factor are relatively low, when avoiding people who are carrying the disease, maintaining a reasonable distance in general, and utilizing proper cleanliness. Certainly, though, a person who already had Covid, as is the case with this Plaintiff, should not be considered a direct threat or an actual risk without clear symptoms, as the CDC confirms, "Covid reinfection is rare." (as shown above)

84)    The idea that masks are actually effective in reducing a direct threat, is debatable, at best. If an entity discriminates against a person with natural immunity without a mask, treating him different and/or less than another person without natural immunity, but with a mask, that is discrimination.  If the fellow with the mask is not considered a direct threat, then the other fellow **with natural immunity without a mask is less of a threat.**

85)    The Supreme Court confirms that fear of a contagious disease in itself is not sufficient grounds to permit discrimination. "Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others." School Bd. of Nassau Cty. v. Arline, 480 US 273 - Supreme Court 1987. See the entire decision.

86)    This Court may grant relief: As in § 36.504 (a) "Authority of court. In a civil action under § 36.503, the court - (1) May grant any equitable relief that such court considers to be appropriate, including, to the extent required by the Act or this part - (i) Granting temporary, preliminary, or permanent relief; (ii) Providing an auxiliary aid or service, modification of policy, practice, or procedure, or alternative method…"

87)     Many think that since ADA violations provide injunctions and/or declaratory relief, since the mask mandates are now over, this claim is moot.

88)     That is not true. There is clearly a continued call for the reinstatement of the mask mandates.

89)     As recently as November 21, 2022, there is a press release from the Department of Health and Human Services ("HHS"), stating that a report was "commissioned by HHS and produced by Coforma, an independent third-party design and research agency. It provides recommendations on how to deliver high-quality care, and relevant and intentional resources and supports to individuals and families impacted by Long COVID." (Link:

https://www.hhs.gov/about/news/2022/11/21/hhs-releases-long-covid-report-providing-insights-and-opportunities-

support.html#:~:text=A%20new%20report%20released%20by,is%20a%20set%20of%20conditions. )

90)     In that report on pages 41 & 63, the HHS Health+ ("Health plus") program recommends new guidelines to "mandate policies and protocols regarding masking and social distancing in public spaces," in order to protect from LONG COVID.  In other words, the federal government is coming back with recommendations to mandate masks.  (Link:

https://www.hhs.gov/sites/default/files/healthplus-long-covid-report.pdf)

91)     While we all hoped the issue would be moot, it clearly is not moot, as it is back on the table pretty quickly.

92)     Plaintiff submits to this Court that although the mask mandate is currently not in effect, the federal government is actively pursuing its reinstatement, and it is very likely that it

will be reinstated by many States, municipalities, and even private businesses, therefore nothing in this Complaint should be deemed as moot.

93)     Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT TWO

94)     **42 U.S. Code § 1985 (3) Conspiracy to interfere with civil rights:** The Defendant conspired with many other companies and people to interfere with Plaintiff's civil rights, by conspiring to deprive him of his right to utilize their public accommodations, and by conspiring to deny him his rights in all the counts listed herein.

95)     Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

96)     42 U.S. Code § 1985 (3)- Conspiracy to interfere with civil rights. "…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

97)     Defendant conspired to deny the Plaintiff access to the Amtrak facilities and trains, and conspired to discriminate against him due to his medical disability.

98)     Plaintiff alleges that the defendant together with similar companies, trains, and airlines, as an industry conspired with each other, with the federal agencies involved, and with the people therein to discriminate against them due to their disabilities.

99)     Defendant may want to respond that there is no clear evidence of them all conspiring, for example a taped conversation where they are heard discussing between each other and agreeing to discriminate against the disabled as a group.  That is not required by the statute.

100)    Take for example, if you see five Ku Klux Klan guys walking down a street with clubs in their hand, and they find and beat up a black person, do you need to hear them on tape conspiring to get together and beat the person in order to claim conspiracy?! Of course not.

101)    The same goes for the transportation industry and the federal agencies that seem to have instigated the discrimination.  They are almost all as an industry and its federal agencies colluding and conspiring to discriminate against plaintiff and those similarly situated. They are acting the same as those Ku Klux Klan bullies.

102)    See Thomas v. Roach, 165 F. 3d 137 - Court of Appeals, 2nd Circuit 1999, it says "A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the `parties have a tacit understanding to carry out the prohibited conduct.'" LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 427 (2d Cir.1995) (quoting United States v. Rubin, 844 F.2d 979, 984 (2d Cir.1988))."

103)    The class-based animus alleged is about an unprecedented, difficult to believe animus that is obvious from this complaint and dozens of other complaints from this Plaintiff and others similarly situated, and from news stories.  The complaints show a disturbing pattern of discrimination towards people with a specific disability that does not allow them to wear a mask.

104)    While it is not the responsibility of the Plaintiffs to determine the source or cause of this animus, it is possible that the political divide in the country between the pro-maskers and the anti-maskers caused them to have animus towards the mask disabled, as they could not or refused to differentiate between them and anti-maskers without mask-disabilities.

105)    We can certainly get to the bottom of the animus during discovery and depositions, but the fact that there is a specific animus to people like us with a mask related disability is absolute.  The animus is so thick it can be sliced with a knife. We have felt it every time we enter a store with a mask policy. Medical centers, airlines, courts, and others, even now give us a dirty look, even when they finally let us in. The animus is most definitely there and Plaintiff will show that before and/or during trial.

106)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT THREE

107)    **42 USC § 1986, Neglecting to Prevent Interference with Civil Rights.** Defendant was aware of the conspiracy to interfere with the civil rights of the disabled by most of their industry, including themselves, banning Plaintiff and similarly disabled from accessing transportation and visiting related facilities and riding their trains, but did nothing to stop it. They possess the power to stop the conspiracy and speak up, but have not taken any action to do so.

108)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

109)    "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case…" 42 USC § 1986.

110)    Section 1986 creates a remedy against persons whose acquiescence make conspiracies to interfere with civil rights possible.

111)    Defendant is liable to Plaintiff for neglecting to prevent interference with his civil rights.

112)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT FOUR

113)    **Discrimination under a program receiving federal funds. Defendants are in violation of The Rehabilitation Act ("RA") of 1973 § 504, 29 U.S.C. § 794 (a),** which says, "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

114)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

115)    Amtrak has been a recipient of significant federal funds as is well known, and as is available on the Department of Transportation website online (Exhibit I).

116)    The discrimination issues are similar to those presented in the first count. "Although there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." Henrietta D. v. Bloomberg, 331 F. 3d 261 - Court of Appeals, 2nd Circuit 2003.

117)    In 29 U.S.C. § 794 it states, "These laws apply to the following entities: (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole."

118)    Plaintiff alleges that Defendant, Amtrak, discriminated against him due to his disability and did not allow him equal access to the public accommodations and as described herein.

119)    The remedies available to the court for both the ADA violations and the Rehabilitation Act violations are up to the court's discretion to award "such relief as may be appropriate," (42 U. S. C. § 2000c–7) as described in Barnes v. Gorman, 536 US 181 - Supreme Court 2002, "Section 202 of the ADA prohibits discrimination against the disabled by public entities; § 504 of the Rehabilitation Act 185*185 prohibits discrimination against the disabled by recipients of federal funding, including private organizations, 29 U. S. C. § 794(b)(3).

120)    Both provisions are enforceable through private causes of action. Section 203 of the ADA declares that the "remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides" for violations of § 202. 42 U. S. C. § 12133. Section 505(a)(2) of the Rehabilitation Act, in turn, declares that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available" for violations of § 504, as added, 92 Stat. 2983, 29 U. S. C. § 794a(a)(2). Thus, the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d et seq., which prohibits racial discrimination in federally funded programs and activities."

121)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## **COUNT FIVE**

122)    **Violation of New York State Human Rights Law ("HRL").**  Defendant violated Plaintiff's civil rights by denying him access to enter its facilities and/or ride its trains, because of his disability.

123)    HRL § 291 (2) "The opportunity to obtain education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space without discrimination because of age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, marital status, or disability, as specified in section two hundred ninety-six of this article, is hereby recognized as and declared to be a civil right."

124)    § 292 (9) "The term "place of public accommodation, resort or amusement" shall include… all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof…"

125)    § 296 (2) (a) "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof…"

126)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

127)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT SIX

128) **New Jersey Human Rights violation; Defendant withheld from and denied to this Plaintiff the facilities and privileges of traveling on Amtrak trains, and** utilizing the lounges and facilities, including those located in New Jersey. Plaintiff travels extremely often to a from New Jersey, as most of his large family resides there.

129) Law Against Discrimination "LAD" defines public accommodations as follows: "A place of public accommodation shall include…any public conveyance operated on land or water or in the air or any stations and terminals thereof;" NJSA 10:5-5. (L)

130) N.J.S.A. 10:5-12 It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: f. (1) For any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof…"

131) Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

132) Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT SEVEN

133) **New Jersey Human Rights LAD; Defendant sent an email notice to Plaintiff conveying that he will not be permitted to travel on Amtrak** (Exhibit G), in violation of the New Jersey LAD.

134) N.J.S.A. 10:5-12 "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: …directly or indirectly to publish, circulate, issue, display,

post or mail any written or printed communication, notice, or advertisement to the effect that any

of the accommodations, advantages, facilities, or privileges of any such place will be refused,

withheld from, or denied to any person, on account of the race, creed, color, national origin,

ancestry, marital status, civil union status, domestic partnership status, pregnancy or

breastfeeding, sex, gender identity or expression, affectional or sexual orientation, disability…"

135)   Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for

this count and for all counts listed thereafter.

136)   Plaintiff's injuries are a direct result of the actions by the Defendant.


## COUNT EIGHT

137)   **NYC Civil Rights Laws:** Unlawful discriminatory practice by denying Plaintiff

equal access to all facilities and to ride from New York City, where Plaintiff resides to various

locations in various states, where he normally travels.

138)   The New York City Administrative Code Title 8: Civil Rights § 8-107 (4) "It

shall be an unlawful discriminatory practice for any person who is the owner, franchisor,

franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or

provider of public accommodation… Because of any person's actual or perceived race, creed,

color, national origin, age, gender, disability, marital status, partnership status, sexual

orientation, uniformed service or immigration or citizenship status, directly or indirectly: (a) To

refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and

conditions, of any of the accommodations, advantages, services, facilities or privileges of the

place or provider of public accommodation."

139)   Public Accommodation is defined as follows: "Place or provider of public

accommodation. The term "place or provider of public accommodation" includes providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available." § 8-102.

140)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

141)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## <u>COUNT NINE</u>

142)    **NYC Civil Rights Laws: Unlawful discriminatory practice by Defendant Amtrak, as they sent an email notice to Plaintiff conveying that he will not be permitted to travel on Amtrak** (Exhibit G), in violation of the NYC Civil Rights Laws.  Plaintiff was notified that he would not be able travel on any Amtrak train or visit any of their facilities in the same manner that non-disabled can travel, and with 72 hours notice, and many more discriminatory requirements and demands, in violation of New York City law.

143)    The New York City Administrative Code Title 8: Civil Rights § 8-107 (4) "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation… 2. Directly or indirectly to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that:  (a) Full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities and privileges of any such place or provider of public accommodation shall be refused, withheld from or denied to any person on account of

race, creed, color, national origin, age, gender, disability."

144)    Public Accommodation is defined as above in the previous count.

145)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

146)    Plaintiff's injuries are a direct result of the actions by the Defendant.


## COUNT TEN

147)    **NYC Civil Rights violation: Defendant failed to engage in a cooperative dialogue within a reasonable timeframe,** rather denied Plaintiff flat out, without offering any options or further discussions.

148)    The New York City Administrative Code Title 8: Civil Rights § 8-107 - 28 (b) Public accommodations. It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require an accommodation related to disability as provided in subdivision 15 of this section.

149)    Defendant violated this New York City Law.

150)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed thereafter.

151)    Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT ELEVEN

152)    **THE PENNSYLVANIA HUMAN RELATIONS ACT; ACT OF 1955**, P.L. 744, NO. 222, AS AMENDED JUNE 25, 1997 BY ACT 34 OF 1997, 43 P.S. §§ 951-963;

153)    SECTION 5. Unlawful Discriminatory Practices. "It shall be an unlawful discriminatory practice… (i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any public accommodation, resort or amusement to: (1) Refuse, withhold from, or deny to any person because of his race, color, sex, religious creed, ancestry, national origin or handicap or disability, … either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement."

154)    It continues to include the following as discrimination, (It shall be an unlawful discriminatory practice… (i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any public accommodation to…) "(3) Exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations or other opportunities to a person because of the handicap or disability of an individual with whom the person is known to have a relationship or association."

155)    In Section 2 (L) it describes the definition of public accommodations and includes the following, "all public conveyances operated on land or water or in the air as well as the stations, terminals and airports thereof,

156)    Amtrak and many of its employees were directly discriminating against this Plaintiff.

157)    Their direct actions caused the injury described herein.


**<u>COUNT TWELVE</u>**

158)    **THE PENNSYLVANIA HUMAN RELATIONS ACT; ACT OF 1955**, P.L. 744, NO. 222, AS AMENDED JUNE 25, 1997 BY ACT 34 OF 1997, 43 P.S. §§ 951-963;

159)    Defendant is in violation for discriminatory practice by Defendant Amtrak, as they sent an email notice to Plaintiff conveying that he will not be permitted to travel on Amtrak (Exhibit G), in violation of these Laws.  Plaintiff was notified that he would not be able travel on any Amtrak train or visit any of their facilities in the same manner that non-disabled can travel, and without 72-hours notice, and many more discriminatory requirements and demands, in violation of Pennsylvania State law.

160)    SECTION 5. Unlawful Discriminatory Practices. "It shall be an unlawful discriminatory practice… (i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any public accommodation, resort or amusement to… (2) Publish, circulate, issue, display, post or mail, either directly or indirectly, any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of race, color, religious creed, sex, ancestry, national origin or handicap or disability…"

161)    In Section 2 (L) it describes the definition of public accommodations and includes the following, "all public conveyances operated on land or water or in the air as well as the stations, terminals and airports thereof…"

162)    Amtrak and many of its employees were directly discriminating against this Plaintiff.  Their direct actions caused the injury described herein.

## <u>COUNT THIRTEEN</u>

**163)    DC HUMAN RIGHTS LAW: Denying a disabled person equal benefits.**

164)    In the Code of the District of Columbia, Chapter 14. Human Rights it states, Part

D. Public Accommodations. § 2–1402.31. Prohibitions.(a) General. — "It shall be an unlawful

discriminatory practice to do any of the following acts, wholly or partially for a discriminatory

reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital

status, personal appearance, sexual orientation, gender identity or expression, familial status,

family responsibilities, genetic information, disability…"

165)    "(1) To deny, directly or indirectly, any person the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, and accommodations of any place of public

accommodations…"

166)    It includes the following public accommodations, "all public conveyances

operated on land or water or in the air, as well as the stations and terminals thereof…"

167)    Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for

this count and for all counts listed herein.

168)    Plaintiff's injuries are a direct result of the actions by the Defendant.


## <u>COUNT FOURTEEN</u>

**169)    DC HUMAN RIGHTS LAW: Sending email to Plaintiff** which indicates that

the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and

accommodations of a place of public accommodation will not be permitted in the same way as

non-disabled people enjoy it, due to Plaintiff's disability**.**

170)     Defendant is in violation for discriminatory practice by Defendant Amtrak, as they sent an email notice to Plaintiff conveying that he will not be permitted to travel on Amtrak (Exhibit G), in violation of these Laws.  Plaintiff was notified that he would not be able travel on any Amtrak train or visit any of their facilities in the same manner that non-disabled can travel, and without 72-hours notice, and many more discriminatory requirements and demands, in violation of DC HUMAN RIGHTS law.

171)     In the Code of the District of Columbia, Chapter 14. Human Rights it states, Part D. Public Accommodations. § 2–1402.31. Prohibitions.(a) General. — "It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability…"

172)     "(2) To print, circulate, post, or mail, or otherwise cause, directly or indirectly, to be published a statement, advertisement, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation will be unlawfully refused, withheld from or denied an individual; or that an individual's patronage of, or presence at, a place of public accommodation is objectional, unwelcome, unacceptable, or undesirable."

173)     It includes the following public accommodations, "all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof…"

174)     Plaintiff incorporates by reference the facts alleged in the earlier paragraphs for this count and for all counts listed herein.

175)     Plaintiff's injuries are a direct result of the actions by the Defendant.

## COUNT FIFTEEN

**176)    Absence of Statutory Authority**

177)    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

178)    Amtrak has a statutory responsibility to provide passenger rail services to the public. Congress has not authorized Amtrak to provide passenger rail services only to those members of the public who waive their right to seek judicial redress for claims against Amtrak in favor of binding arbitration before a private arbitrator.

179)    Amtrak's decision to impose the Arbitration Agreement on plaintiffs as a term and condition of passenger rail service is unlawful because it lacks congressional authorization and violates Amtrak's statutory responsibilities.

## COUNT SIXTEEN

**180)    Violation of the Petition Clause**

181)    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

182)    The First Amendment provides that "Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances." The Petition Clause guarantees individuals' right to access the courts for the resolution of legal disputes.

183)    Amtrak's decision to impose the Arbitration Agreement as a term and condition of passenger rail service violates the Petition Clause because the imposition by a governmental

entity of a requirement to submit claims to binding arbitration before a private arbitrator abridges plaintiffs' right to petition the courts for judicial redress for claims against Amtrak.

### COUNT SEVENTEEN

**184)    Violation of Personal Right to Article III Adjudication**

185)    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

186)    Article III of the U.S. Constitution vests the "judicial Power of the United States" in federal courts whose judges "shall hold their Offices during good Behavior" and shall receive compensation "which shall not be diminished during their Continuance in Office."

187)    Federal district courts have either original or removal jurisdiction to adjudicate all claims against Amtrak, including state and common-law claims, by virtue of 28 U.S.C. § 1349, because Amtrak is a federally chartered stock corporation and the United States owns more than one-half of Amtrak's capital stock.

188)    Article III grants individuals a personal right to have claims properly before a federal court adjudicated by an impartial judge whose independence is protected under Article III.

189)    As a component of the federal government, Amtrak has no authority to take action in derogation of Article III.

190)    Amtrak's decision to impose the Arbitration Agreement as a term and condition of passenger rail service violates Article III by compelling plaintiffs to waive their right to adjudication of disputes against Amtrak in an Article III court if plaintiffs want to purchase tickets or to travel on Amtrak.

## COUNT EIGHTEEN

**191)    Violation of Separation of Powers**

192)    Plaintiffs has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

193)    The constitutional separation of powers does not permit the government to take actions that threaten the institutional integrity of the judicial branch.

194)    As a component of the federal government, Amtrak has no authority to take action that violates the separation of powers.

195)    Amtrak's decision to impose the Arbitration Agreement as a term and condition of passenger rail service threatens the institutional integrity of the judicial branch by purporting to force plaintiffs and millions of other rail passengers to litigate their constitutional, statutory, and common-law claims against Amtrak through a non-governmental process that is separate from—and not subject to constitutionally meaningful judicial supervision or review by—Article III courts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Aaron Abadi, respectfully requests judgment in his favor, as follows:

A.    Declare that Amtrak lacks authority to impose the Arbitration Agreement on ticket purchasers and rail passengers;

B.    Declare that the Arbitration Agreement violates the U.S. Constitution;

C.     Enjoin Amtrak from enforcing existing Arbitration Agreements against plaintiffs;

D.     Enjoin Amtrak to remove the Arbitration Agreement as a term and condition of providing passenger rail services to plaintiffs;

E.     Award Compensatory damages for at least $50,000,000 of which the exact amount will be determined through discovery, at or before trial, and/or through the jury decision;

F.     Award Punitive damages as determined by the Court for the multiple counts where it is applicable;

G.     Declare that Plaintiff is exempt from wearing a mask and should be allowed to go anywhere and everywhere without harassment or discrimination; and that disability laws did not go into abeyance until Covid disappears;

H.     Enjoin Amtrak and require them to notify every employee, and staff member that disability laws are applicable to all, and that they are all required to become familiar with those laws;

I.     Enjoin Defendants and require them to allow Plaintiff to enter all its facilities, and ride any of its trains without any different prerequisites that non-disabled are not required to provide or do;

J.     Award plaintiff his reasonable costs and reasonable attorney fees, when and if applicable;

K.     And such other and further relief as the Court deems just and appropriate.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE

UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND

CORRECT, TO THE BEST OF MY KNOWLEDGE.

Respectfully submitted on May 22, 2023

**s/Aaron Abadi**
AARON ABADI, Plaintiff
82 Nassau Street Apt 140
New York, NY 10038
516-639-4100
Email:  aa@neg.com