UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**AARON ABADI**,

                Plaintiff,

        v.

**NATIONAL RAILROAD PASSENGER CORPORATION**,

                Defendant.

Case No. 1:22-cv-03684 (TNM)

---

**MEMORANDUM OPINION**

Plaintiff Aaron Abadi sued Amtrak for violating various state and federal laws after one of its employees scolded him for refusing to comply with its COVID facemask policy. Amtrak moved to compel arbitration. Because Abadi raised genuine issues of material fact on whether Amtrak's Arbitration Agreement is unconscionable, the Court held Amtrak's motion to compel in abeyance pending an evidentiary hearing. The Court recently held that hearing. And based on the evidence presented, the Court finds that Amtrak's Agreement is not unconscionable. So the Court will grant Amtrak's motion.

**I.**

The Court detailed the factual background of this case in its previous Memorandum Order. *See Abadi v. Nat'l R.R. Passenger Corp.*, No. 1:22-cv-03684 (TNM), 2024 WL 1344403 (D.D.C. Mar. 29, 2024). So a summary will suffice here.

In January 2021, Abadi boarded an Amtrak train in Philadelphia bound for New York City. Am. Compl. ¶ 43, ECF No. 15. At the time, Amtrak required all passengers to "wear a face mask . . . while onboard and in stations unless actively eating or drinking." Decl. of Sunil D. Tewari (Tewari Decl.), ECF No. 18-2. But Abadi could not wear a mask because he has a

"sensory processing disorder" that prevents him from wearing "[a]nything around the face or head." Am. Compl. ¶¶ 28–35. When an Amtrak employee told Abadi to mask up, he refused. *Id*. ¶ 44. The employee then "yelled" at Abadi, telling him he could not ride the train without a mask. *See id*. ¶¶ 44–45.

Abadi sued Amtrak, raising disability discrimination and civil rights claims under federal, state, and D.C. law. *See generally* Compl. ¶¶ 48–153, ECF No. 1. Amtrak asked Abadi whether he consented to arbitration; Abadi refused. *See* Mot. Compel, ECF No. 18, Ex. B, ECF No. 18-3. Then Abadi filed an amended complaint, again raising disability discrimination and civil rights claims. *See generally* Am. Compl. ¶¶ 70–175. In response, Amtrak moved to compel arbitration because Abadi affirmatively accepted Amtrak's Terms and Conditions, which included its Arbitration Agreement. Mot. to Compel. at 1–2.

Early this year, the Court issued a Memorandum Order concluding that the Arbitration Agreement bound Abadi, even though a friend had bought his ticket on his behalf. *Abadi*, 2024 WL 1344403, at *3. But the Court also found that Abadi raised two genuine issues of material fact as to whether the Arbitration Agreement is unconscionable. *Id*. at *4–5.

So the Court held an evidentiary hearing in July to address the "relatively limited issue of unconscionability." Evidentiary Hr'g Tr. (Hr'g Tr.) at 2:15. The parties presented evidence and testimony on two issues: (1) whether Abadi had a meaningful choice in modes of transportation that did not require him to sign an arbitration agreement; and (2) whether the $225 arbitration fee would preclude Abadi from pursuing his case.

## II.

Like any contract, arbitration agreements "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center, W., Inc. v.*

*Jackson*, 561 U.S. 63, 68 (2010) (cleaned up).  Contract-based challenges like unconscionability are governed by state law.  *See Fox v. Comput. World Servs. Corp.*, 920 F. Supp. 2d 90, 97 (D.D.C. 2013).

"Under [District of Columbia] law, a court can void a contract on the grounds that it is unconscionable if the party seeking to avoid the contract proves that the contract was both procedurally and substantively unconscionable."  *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 62 (D.D.C. 2014).  A contract is procedurally unconscionable if there is "an absence of meaningful choice on the part of one of the parties."  *Simon v. Smith*, 273 A.3d 321, 331 (D.C. 2022).  And it is substantively unconscionable if the terms are "unreasonably favorable to the other party."  *Id.*  In all but the most "egregious situation[s]," a party must prove both elements to void a contract.  *Doucette v. Neutron Holdings, Inc.*, 288 A.3d 339, 342 (D.C. 2023).

The District's "unconscionability standard calls for a strongly fact-dependent inquiry." *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1121 (D.C. 2010).  So when parties dispute material facts that go to unconscionability, the Court must conduct a jury trial on arbitrability or an evidentiary hearing if no jury is demanded.  *See* 9 U.S.C. § 4 ("If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine [arbitrability].").  Neither party requested a jury trial here.  Scheduling Conf. Tr., May 17, 2024, at 3–8 (showing Abadi requesting an evidentiary hearing after the Court suggested the possibility of a trial).  Now that the Court has conducted an evidentiary hearing, it concludes that Abadi has not proved either procedural or substantive unconscionability.  So it will grant Amtrak's Motion to Compel Arbitration.

### A.

Start with procedural unconscionability. In its Memorandum Order, the Court narrowed the issue to whether Abadi had a "meaningful choice in transportation options that did not require him to sign an arbitration agreement." *Abadi*, 2024 WL 1344403, at *4.

The Court evaluates whether Abadi had a "meaningful choice" by "consider[ing] all the circumstances surrounding the transaction." *Samenow v. Citicorp Credit Servs., Inc.*, 253 F. Supp. 3d 197, 205 (D.D.C. 2017). For starters, Amtrak's Arbitration Agreement was a "contract of adhesion," meaning that it was "presented in boiler-plate form on a take-it or leave-it basis." *Id*. But this fact alone "does not render the signatory without meaningful choice, and the contract thereby procedurally unconscionable." *Id*. Rather, there "must be something more: a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation *and* that the services could not be obtained elsewhere. . . . Absent this last condition, the party retains the 'real choice' to simply go deal with someone else." *Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 181 (D.D.C. 2016) (cleaned up).

Abadi argues that he lacks any meaningful choice because Amtrak has "almost a complete monopoly" on rail travel in the United States. Pl.'s Resp. to Def.'s Mot. to Compel (Pl.'s Resp) at 6, ECF No. 14. And Abadi explained that he finds rail travel far more attractive than the alternatives. Abadi claims bus trips are "disasters," Hr'g Tr. at 31:20, that leave him "shaking from all that traveling," *id*. at 31:20–21. And "airplanes are just difficult," he says. *Id*. at 36:24. In contrast, Abadi finds train travel less expensive than travel by car, *see, e.g.*, *id*. at 7:2–25, and more comfortable than travel by bus or air, *see id*. at 31:23–25; 36:13–37:1.

But the fact that Abadi favors rail travel does not leave him without "meaningful choice." Abadi's own conduct proves as much. He testified that he has "not been using Amtrak" since the

4

January 2021 incident, *id*. at 28:5–6, and that he traveled "back and forth between Philadelphia and New York City back in 2021," *id*. at 26:10–11, "likely once a week [or t]hree times a month, maybe," *id*. at 26:10–11, "[u]sually by car," *id*. at 28:9.  Abadi confirmed that he has a personal vehicle and uses "it to travel between points" like Philadelphia and New York.  *See id*. at 28:16–19; 36:4–6.  The Court does not credit Abadi's claim—based on selective samples of Amtrak ticket purchases—that a car is generally more costly.  *See* Hr'g Tr. at 7:8–21.  But it will take him at his word that he finds train travel more comfortable than other options.  Still, the presence of these options proves—preferences notwithstanding—that Abadi has a meaningful choice among modes of transportation.  *Accord Samenow*, 253 F. Supp. 3d at 207 n.9 (rejecting plaintiff's argument that "he had no alternative" to a credit card that required arbitration because "only that card offered the same benefits" for his preferred airline carrier).

In short, Abadi's testimony reveals that he had, and continues to have, realistic alternative modes of transportation, none of which he has shown require him to enter into a binding arbitration agreement.  *Cf. Keeton*, 987 A.2d at 1122 n.13 (explaining that plaintiff would lack a meaningful choice if every "[car] dealership in the region also imposes similar arbitration clauses in similar contracts of adhesion").  Because Abadi had other options, the Court concludes that Amtrak's Arbitration Agreement is not procedurally unconscionable.

## B.

Turn now to substantive unconscionability.  A contract is substantively unconscionable if the terms are "unreasonably unfavorable to the party challenging the enforcement of the contract."  *Samenow*, 253 F. Supp. 3d at 208 (applying D.C. law).

The Court previously determined that Abadi raised a genuine issue of material fact on whether the $225 arbitration fee was substantively unconscionable for litigants proceeding *in*

*forma pauperis*.  Following the evidentiary hearing, and having reviewed Abadi's filings in several other lawsuits, the Court finds that $225 fee is not unconscionable as to Abadi, despite his *in forma pauperis* status.  Indeed, the Court has serious concerns that Abadi hid the true extent of his financial resources on his *in forma pauperis* application.[1]

At the evidentiary hearing, Abadi testified inconsistently about his income, sources of income, and indigence.  In his application for leave to proceed *in forma pauperis*, Abadi said he was unemployed, received no pay or wages, received Supplemental Nutrition Assistance Program ("SNAP") benefits, had $49.16 in bank accounts, and incurred monthly expenses for auto insurance ($200), telephone ($120), transportation ($140), and food ($350).  Mot. for Leave to Proceed *in Forma Pauperis*, ECF No. 2.  Abadi also reported debts to friends ($50,000) and hefty credit card balances ($150,000).  *Id*.

But Abadi's tight finances did not prevent him from travelling abroad for a month earlier this year.  *See generally* Pl.'s Am. Letter, ECF No. 28.  Abadi told the Court he was "pursuing a business opportunity in India . . . specifically, the establishment of waste-to-energy power plants," into which he "invested significant personal funds."  *Id*. at 2.  According to Abadi, the project should have been "finaliz[ed] in early 2020."  *Id*.  But "due to unforeseen circumstances such as the onset of the COVID-19 pandemic, the project faced setbacks."  *Id*.  And these setbacks amplified when "airlines, trains, and bus companies refus[ed]" to allow Abadi aboard without wearing a mask.  *Id*.  "Consequently, the project lost its investors, leaving [him] with a

---

[1] Abadi is a prolific filer in federal court.  *See, e.g.*, *Abadi v. Target Corp.*, 2023 WL 137422 (E.D. Pa. Jan. 9, 2023); *Abadi v. City of New York*, 2022 WL 347632 (S.D.N.Y. Feb. 4, 2022); *Abadi v. Dep't of Transp.*, 2021 WL 7500325 (2d Cir. Dec. 29, 2021) (per curiam).  And at least one court dismissed Abadi's case after it found "inconsistencies between the information in Abadi's [IFP] application and his complaint."  *Abadi v. Caesars Enm't, Inc.*, 2022 WL 4117085, at *1 (D. Nev. Aug. 30, 2022).

loss of all his money invested, and without income or prospects[.]" *Id*. Then his fortune changed when he "secured a new financing commitment for the project," which required him to fly "to India to finalize the deal." *Id.*

Sensing a mismatch between Abadi's international business travel and his status as an *in forma pauperis* litigant, the Court ordered him to show cause why his *in forma pauperis* status should not be revoked or his case dismissed under 28 U.S.C. § 1915(e)(2). *See* Order to Show Cause, ECF No. 29. Although Abadi's response provided little clarity, it confirmed his eligibility for SNAP benefits and foreshadowed testimony he later presented at the evidentiary hearing. Pl.'s Resp. to Order to Show Cause, ECF No. 30.

At the hearing, Abadi testified that he had no salary, no savings account, and a checking account "with a few hundred dollars." Hr'g Tr. at 24:15–16. If the India project were to succeed, Abadi said he expected to receive a salary of $150,000 per year. *See id*. at 30:8–15. The Court asked him to reconcile his recent $600 iPhone purchase with his lack of any reported income. *See id*. at 20:1–14. Abadi explained that the money came from investors in the Indian energy project. *See id*. at 21:1–17; 22:16–24. Then he explained that he has received nearly $1.4 million from three investors over the past two years. *See id*. at 21:18–23:1–9. Abadi swore these funds were not a salary. *Id*. at 23:4–9. Yet he admitted the money was deposited into his personal bank accounts. *See id*. at 23:13–24:11.

The oddities continued from there. Abadi admitted that he often stays at an apartment in New York with a monthly rent of $3,500. *See id*. at 25:11–26:6. But he assured the Court that he does not pay the rent; a friend pays rent and uses the apartment. *See id*. at 25:19–26:6.[2]

---

[2] Abadi's address of record is 82 Nassau Street, Apt. 140, New York, NY. According to his testimony, the Nassau Street apartment "is the mailing address," Hr'g Tr. at 25:11, and "[t]he actual apartment is on South End Avenue," *id*. at 25:12–13. It is unclear whether Abadi pays

Abadi considers himself "sort of homeless," *id*. at 25:25, spending time "periodically" at the apartment, *id*. at 25:21, or with his daughter on Long Island, or with his sister in New Jersey, or with his girlfriend in Philadelphia, or in India, *see id*. at 25:22–24.

Abadi also took frequent trips. He travelled between Philadelphia and New York "likely once a week [or] [t]hree times a month, maybe." *Id*. at 26:10–11. And he paid for these trips when he could "afford it." *Id*. at 26:14–15. Sometimes he paid with funds from "a few settlements with certain cases," *id*. at 26:25, and other times with money borrowed from family members, *id*. at 27:2–3; 29:23–25; 30:4–5. Abadi took some of these trips using a car registered in his name.[3] *Id*. at 28:16–20.

Abadi's testimony shows that he had, and continues to have, resources at his disposal, including funds from investors, settlement proceeds, and loans from family members. These funds have proven sufficient for Abadi to live in New York City with a personal vehicle, purchase an iPhone, pursue a waste-to-energy project in India, travel for business, and travel for pleasure to Philadelphia repeatedly each month. These facts, coupled with evidence in the record suggesting that the American Arbitration Association could reduce or waive the fee for an indigent person, *see id*. at 19:12–21, show that Abadi had, and continues to have, sufficient resources to pay the $225 arbitration fee, so it would not be a hardship.

---

rent at the Nassau Street apartment, the South End Avenue apartment, or neither. Abadi maintains that a friend is "paying for it so that [he or she] can use it a little bit," *id*. at 26:5–6, because Abadi "can't afford an apartment," *id*. at 26:6.

[3] Abadi testified that the vehicle "is Toyota Motor Credit's vehicle that they wrote off," Hr'g Tr. at 28:11, suggesting that Abadi obtained financing for the vehicle. Even if Abadi "can't return it if [he] wanted to," *id*. at 28:14–15, there was no testimony that the vehicle has been repossessed or otherwise is unavailable to him or to his sister, who "borrows [it] a lot, and . . . fills it with gas for [him]." *Id*. at 31:10–12.

Ultimately, Abadi's filings and testimony leave significant doubts as to his candor before the Court. One exchange from the evidentiary hearing stands out. On his *in forma pauperis* application, Abadi attested that he had less than $50 in his bank accounts. But on the stand, Abadi admitted that various business "partners"—whose names he could not immediately recall—gave him over $1 million. Hr'g Tr. at 35:11; 22:1–23:25. Abadi claims this was not a salary. Maybe so. Yet he admitted that he deposited these "investments" in his personal account. Hr'g Tr. at 22:12–23:25. At the very least, this means Abadi made material omissions in his *in forma pauperis* application, which requires movants to disclose the "amount of money [they] have in cash or in a checking or savings account." *See* Mot. for Leave to Proceed *in Forma Pauperis*. Due to this inconsistency and others, the Court does not find Abadi's allegations of poverty credible. So the Arbitration Agreement's filing fee is not procedurally unconscionable.

## C.

Finally, the Court must decide whether to dismiss Abadi's claims against Amtrak or stay proceedings pending arbitration. There is a circuit split on this question. *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 387 & n.9 (D.D.C. 2018) (collecting cases); *Gambo v. Lyft, Inc.*, 642 F. Supp. 3d 46, 56 (D.D.C. 2022) (noting the split). The uncertainty arises from § 3 of the Federal Arbitration Act, which provides that courts "shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ." 9 U.S.C. § 3. But the D.C. Circuit has not resolved "whether § 3 mandates a stay or if it permits a court to dismiss a lawsuit when all of the claims before it are subject to an arbitration agreement." *Gambo*, 642 F. Supp. 3d at 56 (cleaned up).

Because all of Abadi's claims are subject to the Arbitration Agreement, and because he does not move to stay, the Court sees no purpose in staying these proceedings. *Accord Gonzales v. GrubHub Holdings, Inc.*, No. 1:23-cv-1650, 2023 WL 6037126, at *2 (D.D.C. Sept. 14, 2023) (dismissing case in which one party moved to dismiss and neither party moved to stay case pending arbitration); *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 134 (D.D.C. 2013) (dismissing rather than staying case in which parties intended arbitrator to resolve issues of arbitrability). The Court would have stayed the case had Abadi so requested. But he made no response to Amtrak's request that the Court dismiss the case rather than issue a stay. *See Law Firm of LarJack, PLLC v. Citibank, N.A.*, No. 21-cv-1592, 2021 WL 4192030, at *6 (D.D.C. Sept. 15, 2021) (granting a motion to dismiss to arbitration when the "plaintiffs made no response to Citibank's request that the Court dismiss the case rather than issue a stay."). So dismissal is appropriate.

### III.

For these reasons, the Court will grant Defendant's Motion to Compel Arbitration. The Court will compel the parties to submit their dispute to arbitration, as required by the Arbitration Agreement. And the Court will dismiss Plaintiff's Amended Complaint without prejudice. A separate Order will issue today.

Dated: October 7, 2024                                           TREVOR N. McFADDEN, U.S.D.J.